SIERRA CLUB, a nonprofit California corporation, Plaintiff,

v.

John BLOCK, in his original capacity as Secretary of Agriculture and Max Peterson, in his official capacity as Chief of the Forest Service, Federal Defendants,

and

Mountain States Legal Foundation, a nonprofit Colorado corporation on behalf of named and unnamed members; Colorado Cattlemen's Association, a nonprofit Colorado corporation; Colorado Farm Bureau, a nonprofit Colorado corporation; National Cattlemen's Association, a nonprofit Colorado corporation; and Colorado Water Congress; Colorado Water Conservation Board; and City and County of Denver, acting by and through its Board of Water Commissioners, Defendant-Intervenors.

Civ. A. No. 84–K–2.

United States District Court, D. Colorado.

Nov. 25, 1985.

Lori Potter, Sierra Club Legal Defense Fund, Denver, Colo., for plaintiff.

Casey Shpall, Mountain States Legal Foundation, Denver, Colo., for Mountain States, et al.

Clyde O. Martz, John M. Sayre, Gregory J. Hobbs, Jr., Zach C. Miller, Bennett W. Raley, Davis, Graham & Stubbs, Denver, Colo., for Colorado Water Congress.

Paula C. Phillips, Lois Witte, Carol Angel, Asst. Attys. Gen., Denver, Colo., for Colorado Water Conservation Bd.

Wayne D. Williams, Michael L. Walker, Henry C. Teigen, Denver, Colo., for City & County of Denver.

Jack F. Ross, Christopher R. Paulson, Melvin B. Sabey, James F. Engelking, Saunders, Snyder, Ross & Dickson, Denver, Colo., special counsel for City & County of Denver.

Stuart Shelton, Office of General Counsel, U.S. Dept. of Agriculture, Washington, D.C., Robert N. Miller, U.S. Atty., Richard J. Nolan, Asst. U.S. Atty., John R. Hill, Jr., U.S. Dept. of Justice, Land & Natural Resources Div., Denver, Colo., for Federal defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

### I. INTRODUCTION

Plaintiff Sierra Club brought this action seeking relief against the following federal officials: John Block, Secretary of Agriculture; Max Peterson, Chief of the Forest Service; William Clark, Secretary of the Interior; and Russell Dickenson, Director of the National Park Service (hereafter referred to as federal defendants).[1] Several

---

**1.** Jeris Danielson, State Engineer of the State of Colorado, was also named as a defendant but has been dismissed from this action. *See Sierra* *Club v. Block,* 615 F.Supp. 44, 47 (D.Colo. July 29, 1984).

parties have since intervened as defendants: Mountain States Legal Foundation, the Colorado Cattlemen's Association, the Colorado Farm Bureau, the National Cattlemen's Association, the City and County of Denver, the Colorado Water Conservation Board, and the Colorado Water Congress (hereafter referred to as defendant-intervenors).

Sierra Club contends that federal reserved water rights exist in each of the designated wilderness areas which federal defendants administer in Colorado,[2] and that these reserved water rights are implied from the Wilderness Act, 78 Stat. 890, 16 U.S.C. §§ 1131 *et seq.* It is further asserted that federal defendants have failed to claim these reserved water rights in violation of their duties under 16 U.S.C. § 526, the Wilderness Act, and the "public trust doctrine". Finally, Sierra Club maintains that federal defendants' failure to carry out their statutory and trust obligations is arbitrary and capricious and unlawfully withholds agency action.

Review of federal defendants' alleged inaction is sought under the Administrative Procedure Act (APA), 80 Stat. 392, 5 U.S.C. §§ 701 *et seq.* Sierra Club requests that I enter a declaratory judgment, pursuant to the Declaratory Judgment Act, 48 Stat. 955, 28 U.S.C. §§ 2201 *et seq.*, to the effect that: 1) federal reserved water rights exist in each of the subject Colorado wilderness areas, and 2) the failure of federal defendants to claim those rights is arbitrary and capricious, constitutes unlawfully withheld agency action, and is a violation of the public trust. Sierra Club also requests an order requiring federal defendants to take such action as I deem necessary to protect reserved water rights in the Colorado wilderness areas. Finally, Sierra Club seeks

---

**2.** The wilderness areas in Colorado, designated as such pursuant to the Wilderness Act, and administered by federal defendants, are as follows:

1) Big Blue Wilderness, Uncompahgre National Forest (December 22, 1980), 94 Stat. 3266;
2) Cache La Poudre Wilderness, Roosevelt National Forest (December 22, 1980), 94 Stat. 3266;
3) Collegiate Peaks Wilderness, Gunnison, San Isabel, and White River National Forests (December 22, 1980), 94 Stat. 3266;
4) Comanche Peak Wilderness, Roosevelt National Forest (December 22, 1980), 94 Stat. 3266;
5) Eagles Nest Wilderness, Arapahoe and White River National Forests (July 12, 1976), 90 Stat. 870;
6) Flat Tops Wilderness, Routt and White River National Forests (December 12, 1975), 89 Stat. 802;
7) Holy Cross Wilderness, San Isabel and White River National Forests (December 22, 1980), 94 Stat. 3266;
8) Hunter-Fryingpan Wilderness, White River National Forest (February 24, 1978), 92 Stat. 41;
9) Indian Peaks Wilderness, Arapahoe and Roosevelt National Forests (October 11, 1978), 92 Stat. 1095;
10) La Garita Wilderness, Gunnison and Rio Grande National Forests (September 3, 1964), 78 Stat. 891;
11) Lizard Head Wilderness, San Juan and Uncompahgre National Forests (December 22, 1980), 94 Stat. 3266;
12) Lost Creek Wilderness, Pike National Forest (December 22, 1980), 94 Stat. 3266;
13) Maroon · Bells-Snowmass Wilderness, White River National Forest (September 3, 1964), 78 Stat. 891;
14) Mount Evans Wilderness, Arapahoe and Pike National Forests (December 22, 1980), 94 Stat. 3267;
15) Mount Massive Wilderness, San Isabel National Forest (December 22, 1980), 94 Stat. 3267;
16) Mount Sheffels Wilderness, Uncompahgre National Forest (December 22, 1980), 94 Stat. 3267;
17) Mount Zirkel Wilderness, Routt National Forest (September 3, 1964), 78 Stat. 891;
18) Neota Wilderness, Roosevelt National Forest (December 22, 1980), 94 Stat. 3267;
19) Never Summer Wilderness, Arapahoe National Forest (December 22, 1980), 94 Stat. 3267;
20) Raggeds Wilderness, Gunnison and White River National Forests (December 22, 1980), 94 Stat. 3267;
21) Rawah Wilderness, Roosevelt National Forest (September 3, 1964), 78 Stat. 891;
22) South San Juan Wilderness, San Juan National Forest (December 22, 1980), 94 Stat. 2419;
23) Weminuch Wilderness, Rio Grande and San Juan National Forests (January 3, 1975), 88 Stat. 2155; and
24) West Elk Wilderness, Gunnison National Forest (September 3, 1964), 78 Stat. 891.

an award of attorneys' fees and costs against federal defendants under the Equal Access to Justice Act, 94 Stat. 2325, 5 U.S.C. § 504, 15 U.S.C. § 634b, 28 U.S.C. §§ 2412 *et seq.*, 42 U.S.C. § 1988. Jurisdiction is asserted, and is proper, under 28 U.S.C. § 1331 and the APA.[3]

This matter is presently before me on: 1) federal defendants' motion to dismiss Sierra Club's public trust claim, 2) federal defendants' motion to dismiss, or in the alternative, for summary judgment, 3) defendant-intervenors' motion for summary judgment, and 4) Sierra Club's cross-motion for summary judgment.[4] These motions present the following issues to be decided: 1) whether federal reserved water rights exist with respect to the designated Colorado wilderness areas, 2) whether federal defendants have a duty to administer the wilderness areas pursuant to the "public trust doctrine", and 3) whether federal defendants' failure to assert reserved water rights is arbitrary, capricious, or unlawful under the APA, or violates the public trust.

Before I can reach these questions, however, I must determine whether Sierra Club has standing to sue in this case.

## II. STANDING

The doctrine of standing stems from Article III of the Constitution which limits the judicial power of the courts to "cases" and "controversies". This limitation has been interpreted to require that parties have, among other things, a "sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy...." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). That question "has traditionally been referred to as the question of standing to sue." *Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364.

Different inquiries are made, however, concerning the issue of standing; depending on whether the plaintiff attacks federal action on statutory or constitutional grounds. As stated in *Morton,*

> [w]here the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," *Baker v. Carr,* 369 U.S. 186, 204, 7 L.Ed.2d 663, 678, 82 S.Ct. 691, [703] as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v. Cohen,* 392 U.S. 83, 101, 20 L.Ed.2d 947, 962, 88 S.Ct. 1942 [1953]. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.

*Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364 (footnote omitted).

In the instant case, Sierra Club attacks federal defendants' failure to assert reserved water rights for the wilderness areas on statutory grounds. Thus, my inquiry regarding standing must begin with a determination of whether the statute in question authorizes review.

■ Sierra Club seeks review of federal defendants' inaction under § 10(a) of the

---

**3.** Previously, federal defendants had moved to dismiss on the ground that their alleged failure to claim reserved water rights for wilderness areas was not subject to judicial review under the APA. I ruled that the United States Supreme Court's decision in *Heckler v. Chaney,* —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), did not preclude review in this case because, under the Wilderness Act, there was "law to apply". *Sierra Club v. Block,* 615 F.Supp. 44, 47–48 (D.Colo.1985). In other words, "[t]he Wilderness Act provides both legislative di-

rection and manageable standards by which to judge the agency's failure to act in this case." *Id.* at 48.

**4.** Defendant-intervenors' pending motion to dismiss or, in the alternative, for summary judgment, is mooted by my previous decision denying, in part, federal defendants' motion to dismiss. *See Sierra Club v. Block,* 615 F.Supp. 44, 48 (D.Colo.1985).

APA, 5 U.S.C. § 702. That statute provides for judicial review of agency actions, or inactions, under certain circumstances: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Among other assertions, Sierra Club contends that it has been "adversely affected or aggrieved" by federal defendants' failure to comply with their duties under the Wilderness Act. In order to have standing under § 10(a) of the APA, persons "adversely affected or aggrieved" must allege that the challenged action has caused them "injury in fact" and that the alleged injury is "arguably within the zone of interests to be protected or regulated" by the statute that the agency was claimed to have violated. *See Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

■ The injury in fact alleged by Sierra Club is to the "aesthetic, conservational, and recreational" values of the wilderness areas:

> [t]he members of the Sierra Club regularly use and enjoy the wilderness areas in Colorado for aesthetic, conservational, and recreational purposes, including hiking, camping, wildlife viewing, photography, scientific study, and spiritual regeneration. To achieve these purposes, the Sierra Club and its members have, and will continue to have in the future, an interest in the protection, preservation, and management of wilderness and wilderness waterways so as to maintain their natural condition. These aesthetic, conservational, and recreational interests of the Sierra Club and its members will be harmed or defeated by the loss of the United States' reserved water rights in wilderness.

Sierra Club's Second Amended Complaint ¶ 5 at 2.

This alleged harm unquestionably constitutes "injury in fact." As stated by the Supreme Court in *Morton*, "[a]esthetic and environmental well-being, like economic

well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." 405 U.S. 727, 734, 92 S.Ct. 1361, 1365. The "injury in fact" test further requires, however, that the party seeking review be himself among the injured. *Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366.

■ The Sierra Club is a national conservation organization with an historic commitment to the cause of protecting this country's natural heritage from man's depredations. *See Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368; Sierra Club's Second Amended Complaint ¶ 4 at 2. Although Sierra Club itself would not have standing to sue based merely on its "special interest" in protection of the environment, *see Morton*, 405 U.S. 727, 739–40, 92 S.Ct. 1361, 1368, it would have standing to sue on behalf of its members if it was established that:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975).

■ These prerequisites to "associational standing" are clearly present in the instant case. Sierra Club, in connection with its cross-motion for summary judgment, has submitted an affidavit of one of its members which establishes that many of the members use each of the Colorado wilderness areas for aesthetic and recreational purposes, that the water resources are critical to their use and enjoyment of these areas, and that they have been injured in fact. *See* Sierra Club's Exhibit H, Affidavit of Martin Sorenson. Thus, it is

clear that Sierra Club's members would otherwise have standing to sue in their own right. Further, it goes almost without saying that Sierra Club's interest in protecting reserved water rights in the wilderness areas is consistent with its purpose of protecting this country's natural heritage. Finally, it is apparent that neither the claim asserted nor the relief requested requires the participation of the individual members. The claim is not specific as to any individual member nor do these members claim damages or other relief which would require individualized proof. *See Warth*, 422 U.S. 490, 515–16, 95 S.Ct. 2197, 2213–14. Accordingly, Sierra Club has standing to sue on behalf of its members.

■ The final issue regarding standing in this case is whether the alleged injury is arguably within the zone of interests to be protected or regulated by the Wilderness Act. As discussed more extensively below, Congress, in enacting this statute, mandated that the federal agencies charged with administering the wilderness areas act to preserve and protect those areas, including water resources. Given this mandate, the injury alleged by Sierra Club, caused by federal defendants' failure to claim reserved water rights in the wilderness areas, is arguably within the zone of interests to be protected or regulated by the Wilderness Act. Thus, Sierra Club has standing to sue in this case.

I now turn to the issues presented by the parties for decision.

## III. BACKGROUND

As will become apparent, resolution of these issues, particularly that of whether federal reserved water rights exist in the Colorado wilderness areas, centers primarily on the legislative history and the specific provisions of the Wilderness Act. Thus, as a preliminary matter, I shall first consider this Act and its history.

From 1924 to 1939, the Secretary of Agriculture and the Chief of the Forest Service took it upon themselves to set aside certain primitive areas of the national forests as wilderness-type areas. *See* H.R. Rep. No. 1538, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad. News 3615, 3616; *see also* 110 Cong.Rec. 17427 (statement of Rep. Aspinall). In setting aside these areas, the Secretary of Agriculture and the Chief of the Forest Service intended that they be managed in such a way as to give them greater protection from commercial enterprise, and to preserve their primitive character. Although this action was widely approved, concern was expressed, beginning in the late 1940s and early 1950s, regarding the federal officials' unrestricted power over, and the tenuous status of, these wilderness-type areas. For example, as stated in a House report,

> [e]xcept for the Boundary Waters Canoe Area, none of the areas has been granted statutory recognition. Having been established by administrative action of the executive branch, any of the wilderness, wild and primitive areas could be similarly declassified and abolished by administrative action. In the alternative the administrators could, if they so desired, change the rules governing the uses allowed or prohibited within such areas.

H.R.Rep. No. 1538, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad. News 3615, 3616.

This concern prompted the introduction of legislation in 1956 to give statutory recognition to, and congressional control over, the wilderness-type areas.[5] It was generally felt by members of Congress that a statutory framework was needed in order

---

5. The movement to establish a wilderness preservation system actually began in 1948 when members of Congress asked the Legislative Reference Service, Library of Congress, to study the desirability of a federal policy and program of wilderness preservation. More than seven years of study and consideration of the wilderness problem elapsed between the issuance of the Library report and the perfection of a wilderness proposal for preservation to Congress. "A study bill, S. 4013, was presented late in the 84th Congress, succeeded the following year by S. 1176 of the 85th Congress by Senator Humphrey, and others." S.R.Rep. No. 109, 88th Cong., 1st Sess. at 7 (1963).

to "permit long-range planning and assure that no future administrator could arbitrarily or capriciously either abolish wilderness areas that should be retained or make wholesale designation of additional areas in which use would be limited." H.R.Rep. No. 1538, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News 3615, 3616–17.

After eight years of debate and consideration of successive bills on the subject, Congress established the National Wilderness Preservation System by passing the Wilderness Act on September 3, 1964. Initially, the Wilderness Act gave "statutory designation as wilderness to all but one of the areas classified by the Department of Agriculture or the Chief of the Forest Service ... and provide[d] for their inclusion in [the] national wilderness preservation system." 110 Cong.Rec. 17427 (statement of Rep. Aspinall). Since 1964, however, Congress has designated many additional areas of federally-owned land as wilderness pursuant to the Act.

■ As the legislative history and the provisions of the Wilderness Act make abundantly clear, the primary motivation of Congress in establishing the wilderness preservation system was to "guarantee[ ] that these lands will be kept in their original untouched natural state." 110 Cong. Rec. 17448 (statement of Rep. Cleveland); *see* 16 U.S.C. § 1131(a). Congress was very concerned that the wilderness areas be protected rather than exploited for commercial purposes: "We cannot afford the continuous destruction of this valuable resource that, once despoiled, can never be recovered." 110 Cong.Rec. 17435 (statement of Sen. Barry). The reason Congress wished to protect the wilderness areas was to "preserve for present and future generations, land in its original state to be used and enjoyed by all who are interested in outdoor life and conservation." 110 Cong. Rec. 17437 (statement of Rep. Riehlman); *see also* 16 U.S.C. § 1131(a).

These basic premises are reflected in Congress' statement of policy in the Wilderness Act:

In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as "wilderness areas", and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness; and no Federal lands shall be designated as "wilderness areas" except as provided for in this chapter or by a subsequent Act.

16 U.S.C. § 1131(a).

Under the Act, a wilderness area is defined as

an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient

size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value. 16 U.S.C. § 1131(c).

Regarding the administration of areas designated as wilderness, Congress provided that "the area shall continue to be managed by the Department and agency having jurisdiction thereover immediately before its inclusion in the ... [system] unless otherwise provided by Act of Congress." 16 U.S.C. § 1131(b). Under § 1133(b), "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." Specifically, Congress mandated that "wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b).

In preserving the natural state of the wilderness areas, Congress prohibited or seriously limited most uses inconsistent with the protection of the wilderness, such as mining, timbercutting, road-building, and other commercial uses. See 16 U.S.C. § 1133(c) and (d). In this respect, wilderness areas differ greatly from the national forests, for example, where such uses are permitted. See S.R.Rep. No. 109, 88th Cong., 1st Sess. at 12–15 (1963).

In Colorado, there are presently 24 areas which were originally part of the national forests but have been designated as wilderness pursuant to the Wilderness Act.[6] It is within these areas that Sierra Club contends federal reserved water rights exist.

## IV. FEDERAL RESERVED WATER RIGHTS

Both defendant-intervenors' motion for summary judgment and Sierra Club's cross-motion for summary judgment raise the issue of whether federal reserved wa-ter rights exist in the designated Colorado wilderness areas. Sierra Club asserts that Congress' intent to reserve these rights can be implied from the Wilderness Act and that they exist under the implied-reservation-of-water doctrine. Defendant-intervenors, on the other hand, contend that no reservation of federal water rights may be implied by wilderness designations since the wilderness areas do not constitute "withdrawals from the public domain" or reservations. Despite defendant-intervenors' contentions, however, for the reasons stated below, I now explicitly hold, and enter final declaratory judgment, pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706, that federal reserved water rights do exist in the designated Colorado wilderness areas.

### A. Implied-Reservation-of-Water Doctrine

The doctrine of implied-reservation-of-water is judicially created. It had its beginnings in dictum in *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899). There, the United States Supreme Court stated that "in the absence of specific authority from Congress a State cannot by its legislation destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters; so far at least as may be necessary for the beneficial uses of the government property." 174 U.S. 690, 703, 19 S.Ct. 770, 775. The doctrine was first recognized, however, in *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). In *Winters*, the United States, as trustee for the Indian tribes occupying the Fort Belknap reservation in Montana, sought to enjoin upstream defendants on the Milk River from withdrawing water that was required for an irrigation project on the reservation. The defendants had appropriated water under Montana law after the reservation was established in 1888 but before 1898, when the Indian irrigation project was constructed. The Supreme Court held that the creation of the Fort Belknap reservation not only set aside land

---

**6.** *See supra* note 2.

but also impliedly reserved a sufficient quantity of water to fulfill the purposes of the reservation. 207 U.S. 564, 576–77, 28 S.Ct. 207, 211. The Court further determined that the priority date of the government's reserved rights was the date of the reservation. 207 U.S. 564, 577, 28 S.Ct. 207, 211.

The effect of *Winters* was to superimpose a judicially implied federal water right on a state system that based water rights on prior appropriation.[7] The full implications of this decision were not apparent, however, until over fifty years later when the Court considered the application of the doctrine to non-Indian federal reservations in *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

In *Arizona*, the Supreme Court held that the implied-reservation-of-water doctrine "was equally applicable to other federal establishments such as National Recreation Areas and National Forests." 373 U.S. 546, 601, 83 S.Ct. 1468, 1498. The Court based the reservations not on ownership of the water but on federal power to regulate navigable waters under the Commerce Clause and to regulate government lands under the Property Clause. 373 U.S. 546, 597–98, 83 S.Ct. 1468, 1496. It also spoke of this power in terms of federal supremacy: "We have no doubt about the power of the United States under these clauses to reserve water rights for its reservations and its property." 373 U.S. 546, 598, 83

S.Ct. 1468, 1496. *See* Trelease, *Water Law*, 816–17 (2d ed. 1974).[8]

The existence of this doctrine is now well-established as a matter of federal law. *See United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976); *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *United States v. District Court in and for the County of Eagle*, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *Federal Power Commission v. State of Oregon*, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955); *United States v. Powers*, 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330 (1939); *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899).

In *Cappaert v. United States*, the Court set forth the basis and scope of the reserved rights doctrine:

This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unap-

---

**7.** This effect has been a source of substantial frustration to the states for several reasons. First, recognition of federal reserved water rights restricts the exercise of state sovereignty and in some instances preempts provisions of state constitutions or statutes. Second, these rights interfere with efficient operation of state prior appropriation systems. Because federal rights can arise by withdrawal of public domain lands without any physical appropriation and application to a beneficial use, other water users may be unable to ascertain the amount of unappropriated water. State law appropriators acquiring rights after a federal reservation receive only a defeasible property right until the extent of the federal right is established. ... Third, federal reserved water rights have in the past frustrated state attempts to administer water law in their own courts.

Coggins & Wilkinson, *Federal Public Land and Resource Law* 306 (1981), *quoting* Abrams, *Reserved Water Rights, Indian Rights ad the Narrowing Scope of Federal Jurisdiction: The Colorado River Decision*, 30 Stan.L.Rev. 1111, 1113–14 (1978).

**8.** "Reserved water rights stem from the supremacy clause and the need for water to carry out federal functions. The power to make such reservations cannot be doubted, and they can be created by any form of notice of intent to use unappropriated water for any contemplated federal purpose on any lands in any state of the union." Trelease, *Water Law* 817 (2d ed. 1974), *quoting* Trelease, *Federal-State Relations in Water Law*, National Water Commission Legal Study No. 5, 147 i–147 1 (1971).

propriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Reservation of water rights is empowered by the Commerce Clause, Art I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art IV, § 3, which permits federal regulation of federal lands. The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams.

*Cappaert*, 426 U.S. 128, 138, 96 S.Ct. 2062, 2069 (citations omitted).

In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the threshold question necessarily is whether the government has in fact withdrawn the land from the public domain and reserved it for a public purpose. Once it has been determined that the government has withdrawn and reserved the land, the primary issue is whether the government intended to reserve unappropriated water. *Cappaert*, 426 U.S. 128, 139, 96 S.Ct. 2062, 2069. Central to this inquiry is a careful examination of "both the asserted water right and the specific purposes for which the land was reserved." *New Mexico*, 438 U.S. 696, 700, 98 S.Ct. 3012, 3014. If previously unappropriated waters are necessary to accomplish the primary, rather than secondary, purposes for which the reservation was created, then intent to reserve water rights for those purposes is inferred. *See Cappaert*, 426 U.S. 128, 139, 96 S.Ct. 2062, 2069; *New Mexico*, 438 U.S. 696, 702, 98 S.Ct. 3012, 3015.

For example, in *Cappaert*, the Supreme Court held that the United States had reserved water rights in a pool located at Devil's Hole, which is part of the Death Valley National Monument. 426 U.S. 128, 147, 96 S.Ct. 2062, 2073. In determining that these reserved rights existed, the Court examined the history of the government's reservation of Devil's Hole. The Court found that Devil's Hole is

> on land owned by the United States since the Treaty of Guadalupe Hidalgo in 1848,

9 Stat. 922. By the Proclamation of January 17, 1952, President Truman withdrew from the public domain a 40-acre tract of land surrounding Devil's Hole, making it a detached component of the Death Valley National Monument. Proclamation No. 2961, 3 CFR 147 (1949–1953 Comp). The Proclamation was issued under the American Antiquities Preservation Act, 34 Stat. 225, 16 U.S.C. § 431 ... which authorizes the President to declare as national monuments "objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States...."

> The 1952 Proclamation notes that Death Valley was set aside as a national monument "for the preservation of the unusual features of scenic, scientific, and educational interest therein contained." The Proclamation also notes that [the pool at] Devil's Hole ... is "of such outstanding scientific importance that it should be given special protection...."

*Cappaert*, 426 U.S. 128, 131–32, 96 S.Ct. 2062, 2066 (footnote omitted).

Based on the 1952 Proclamation and the American Antiquities Preservation Act, the Court ruled that, in withdrawing Devil's Hole from the public domain, the government reserved the land for the purpose of preserving the scientific interest of the pool. 426 U.S. 128, 141, 96 S.Ct. 2062, 2700. Thus, the Court determined that the government had impliedly reserved those water rights necessary to maintain the pool and the rare species of fish which inhabited it. 426 U.S. 128, 141, 96 S.Ct. 2062, 2070.

In *New Mexico*, on the other hand, the Supreme Court denied the government's claim to additional reserved water rights in the Gila National Forest for recreation, aesthetics, wildlife preservation, and cattle grazing. 438 U.S. 696, 711–12, 718, 98 S.Ct. 3012, 3023. There, the question was "what quantity of water, if any, the United States reserved out of the Rio Mimbres [River] when it set aside the Gila National Forest in 1899...." 438 U.S. 696, 698, 98 S.Ct. 3012, 3013. In deciding this issue, the

Court examined the purposes for which Congress authorized the creation of the national forests. The Court found that

[t]he legislative debates surrounding the Organic Administration Act of [June 4,] 1897 [30 Stat. 34, 16 U.S.C. §§ 473 et seq.] and its predecessor bills demonstrate that Congress intended national forests to be reserved for only two purposes—"[t]o conserve the water flows and to furnish a continuous supply of timber for the people." 30 Cong.Rec. 967 (1897) (Cong. McRae).

*New Mexico,* 438 U.S. 696, 707, 98 S.Ct. 3012, 3017.

Given this explication of the original and primary purposes of the national forests, the Court ruled that any additional purposes created by the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), 74 Stat. 215, 16 U.S.C. §§ 528 et seq., including recreation and wildlife purposes, were only secondary. 438 U.S. 696, 715, 98 S.Ct. 3012, 3021. The Court further ruled that Congress did not intend to reserve water for these secondary purposes. 438 U.S. 696, 715, 98 S.Ct. 3012, 3021.

### B. Withdrawal and Reservation

In the instant case, Sierra Club maintains that the doctrine of implied-reservation-of-water applies and that federal reserved water rights exist in the subject wilderness areas. As stated above, in determining whether there is a reserved water right implicit in a federal reservation of public land, the threshold question is whether the government has in fact withdrawn and reserved the land. Although this issue must be answered affirmatively before it can be determined whether reserved water rights may be implied, it is significant that no court has directly addressed this issue. In each case dealing with federal reserved water rights, it has been obvious that there has been a withdrawal and reservation of the subject lands. The inquiry in those cases has focused on the purposes of the reservation and whether Congress intended water rights to be reserved. Thus, in the instant case, this threshold question is essentially one of first impression. Because

there are no precedents helpful in resolving this issue in the context of the instant case, it is necessary to begin by defining the terms involved.

Generally, the lands owned by the federal government are classified as either "public domain" or "reserved". The public domain includes

lands open to settlement, public sale, or other disposition under the federal public land laws, and which are not exclusively dedicated to any specific governmental or public purpose. *See, e.g., Federal Power Commission v. Oregon,* 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955); *United States v. Minnesota,* 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926). Public domain lands are, for the most part, managed by the United States Department of the Interior through its Bureau of Land Management.

*United States v. City and County of Denver by and through Board of Water Commissioners,* 656 P.2d 1, 5 (Colo.1982) (footnote omitted).

Reserved lands, on the other hand, are those that have been expressly withdrawn from the public domain by statute, executive order, or treaty, and are dedicated to a specific federal purpose. Pursuant to the authority vested in the United States by Article IV, Section 3 of the United States Constitution, Congress has frequently acted to reserve or withdraw lands from the public domain or to empower the President or his delegate to do so. *See United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *United States v. Midwest Oil Co.,* 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915). Among these reservations are national forests, national parks, national monuments, public springs and waterholes, and public mineral hot springs.

*Denver,* 656 P.2d 1, 5 (footnote omitted).

Although often used interchangeably, the terms "withdraw" and "reserve" have different meanings. "Withdrawal" generally refers to the act of removing certain lands from the operation of federal mining,

homestead or other disposal and use-related laws. "Reservation", on the other hand, as stated above, generally refers to the dedication of federal lands to a specific federal purpose. *See* II C. Wheatley, *Withdrawals and Reservations of Public Domain Lands*, A–1, Report to Public Land Law Review Commission (1969); Public Land Law Review Commission, *One Third of the Nation's Land*, 42 n. 1 (1970). The reason these terms are used interchangeably is that, usually, a reservation includes a withdrawal.

■ In the instant case, each of the subject wilderness areas was created from previously reserved national forest lands in Colorado.[9] Defendant-intervenors argue that, because the lands had already been withdrawn from the public domain and reserved for national forest purposes, subsequent wilderness designation did not constitute a "withdrawal from the public domain." Rather, defendant-intervenors contend, the Wilderness Act was merely intended as a set of statutory land management directives to be followed by the U.S. Forest Service in its administration of designated areas within previously reserved national forests. According to defendant-intervenors, since national forest wilderness designations do not constitute "withdrawals" or "reservations", no reservation of federal water rights may be implied by such designations.

Although wilderness designation was not the *original* withdrawal from the public domain and reservation of the land in this case, it does not follow that wilderness areas were not withdrawn and reserved or that the implied-reservation-of-water doctrine is not applicable. On the contrary, application of the definitions of "withdrawal" and "reservation" to this case, as well as legislative history of the Wilderness Act, clearly demonstrate that the wilderness areas were in fact withdrawn and reserved.

First, it is clear from the Wilderness Act itself that the wilderness areas designated pursuant to the Act were withdrawn from

use-related laws. For example, 16 U.S.C. § 1133(d)(3) states that "the minerals in lands designated by this chapter as wilderness areas are *withdrawn* from all forms of appropriation under the mining laws and from disposition under all laws pertaining to mineral leasing and all amendments thereto." (emphasis added). Other provisions seriously limit additional uses inconsistent with wilderness preservation. Section 1133(c) provides that

> there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

Grazing of livestock in wilderness areas is only permitted where established before the date of enactment of the Wilderness Act. 16 U.S.C. § 1133(d)(4). Further, the areas have "long been withdrawn from [timber] cutting." S.R.Rep. 109, 88th Cong., 1st Sess. at 4 (1963). Finally, diversion or impoundment of water is permitted only where the President determines that use of water resources is necessary in the public interest and specifically authorizes such use. 16 U.S.C. § 1133(d)(4).

Additionally, the Wilderness Act specifies particular federal purposes to which the wilderness areas are dedicated. These purposes are contained in several provisions of the Act. Under 16 U.S.C. § 1131(a), wilderness areas are designated for the purpose of "preservation and protection in their natural condition ... to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." Wilderness is defined by 16 U.S.C. § 1131(c) to be

**9.** *See supra* note 2.

"an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain," and is further defined as "retaining its primeval character and influence, without permanent improvements or human habitation ... [which] has outstanding opportunities for solitude or a primitive and unconfined type of recreation; ... [and] may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value." Finally, Congress mandated that the "wilderness areas shall be devoted to the public purposes of recreation, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b).

Moreover, there are several instances in the legislative history of the Wilderness Act which demonstrate that Congress intended that the wilderness areas be withdrawn and reserved.[10] First, the debates regarding the Wilderness Act reveal that it was the "outgrowth" of investigations and a report by the Outdoor Recreation Resources Review Commission. *See* 110 Cong.Rec. 17446 (statement of Rep. Reid); *see also* 110 Cong.Rec. 5885–86 (statement of Sen. Anderson); 110 Cong.Rec. 5899 (statements of Sen. Metcalf). This commission was composed of four members of the House, four members of the Senate, and seven individuals appointed by President Eisenhower.[11] *See* 110 Cong.Rec. 5886 (statement of Sen. Anderson). After three years of investigation and research, the commission issued a report in January 1962. In that report, which members of Congress quoted from during the debate on

the Wilderness Act, *see, e.g.*, 110 Cong.Rec. 5885 (statements of Sen. Anderson), the commission stated that

[t]here is a widespread feeling, which the Commission shares, that the Congress should take action to assure the permanent *reservation* of these [wilderness areas] and similar suitable areas in national forests, national parks, wildlife refuges, and other lands in Federal ownership.

Outdoor Recreation Resources Review Commission, *Outdoor Recreation for America, A Report to the President and to the Congress* (1962) (emphasis added).

Other statements made by members of Congress to that effect during the debate on the Act include the following:

Unless the existing areas of true wilderness are *reserved* now, the inuence [sic] of man is inevitably going to consume all that we have.

110 Cong.Rec. 17448 (statement of Rep. Springer) (emphasis added).

Thousands of Americans have long urged the Congress to work its will to establish a national policy and program to preserve for posterity a part of our unspoiled wilderness. The American people feel that the time has been too long delayed and that Congress should take positive action to assure the permanent *reservation* of suitable wilderness areas now.

110 Cong.Rec. 17443 (statement of Rep. Boland) (emphasis added).

The purpose of this bill and the objective of those who have introduced wilderness bills in past sessions of Congress

---

**10.** I am aware that different aspects of legislative history are generally given varying degrees of weight. *See* 2A N. Singer, *Sutherland Statutory Construction* §§ 48.01 *et seq.* (4th ed. 1984). For example, the reports of the congressional committees are given more weight than statements made by individual legislators during legislative discourse and debate. In the instant case, however, in determining the intent of Congress, I find that all of the legislative history is relevant and probative on this issue. Statements made by members of Congress regarding the Wilderness Act are particularly helpful here in amplifying Congress' intent and the underlying purposes of the Act.

**11.** Congress authorized the creation of this commission in 1958. 72 Stat. 238. The chairperson was Laurence Rockefeller. United States Senate members included Clinton Anderson (New Mexico), Henry Dworshak (Idaho), Henry Jackson (Washington), and Jack Miller (Iowa). Members of the United States House of Representatives included John Saylor (Pennsylvania), Gracie Pfost (Idaho), Ralph Rivers (Alaska), and John Kyl (Iowa). Presidential commissioners included Samuel Dana, Marian Dryfoos, Bernard Lorell, Joseph Penfold, M. Federik Smith, and Chester Wilson.

has been to establish by legislative action a firm *reservation* of these great remaining natural, scenic areas, so that they will remain inviolate in their present form for future generations to enjoy as we can enjoy them today.

110 Cong.Rec. 17437 (statement of Rep. Baldwin) (emphasis added).

In conclusion, I would like to call to the attention of this body the widespread opinion throughout the country that Congress should take action to assure the permanent *reservation* of these areas.

110 Cong.Rec. 17435 (statement of Rep. Barry) (emphasis added).

The fact that the Wilderness Act withdrew the designated wilderness areas from disposal or use-related laws and that it established specific purposes for the wilderness areas amply demonstrates that Congress intended that these areas be "withdrawn" and "reserved". The use of the word "reservation" in the ORRRC report, as well as by members of Congress, in referring to the wilderness areas, further evidences Congress' intent to "withdraw" and "reserve" the wilderness areas. Accordingly, I hold that a withdrawal and reservation of these lands has been made.

■ Defendant-intervenors' argument that the withdrawal must be originally from the public domain in order for reserved water rights to exist is without merit. It is true that the Supreme Court, in defining the implied-reservation-of-water doctrine, has referred to withdrawal in the context of withdrawing land "from the public domain." *See Cappaert,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069; *New Mexico,* 438 U.S. 696, 698–99, 98 S.Ct. 3012, 3013. In both *Cappaert* and *New Mexico,* however, the subject reservations *were* the original withdrawals from the public domain. The Court had no occasion to discuss the application of the doctrine to a second withdrawal of lands. The Court used the phrase "from the public domain" because the subject lands in those cases were the original withdrawals from the public domain. There is nothing in those cases which suggests that the doctrine applies *only* to lands *originally* withdrawn from the public domain. Moreover, there is some indication that the Supreme Court would imply reserved water rights where there has been a second withdrawal and reservation of lands. In *Arizona v. California,* the Supreme Court granted reserved water rights for the second withdrawal and reservation of Havasu Lake National Wildlife Refuge and Lake Mead National Recreation Area. 373 U.S. 546, 601, 83 S.Ct. 1468, 1498, 10 L.Ed.2d 542 (1963); 376 U.S. 340, 345–46, 84 S.Ct. 755, 758, 11 L.Ed.2d 757 (1964). Both of these reservations had been withdrawn first for a water project and a possible national monument and then a second time as natural preserves.[12]

■ Defendant-intervenors' contention that the Wilderness Act is merely a land management statute is similarly without merit. Defendant-intervenors attempt to liken the Wilderness Act to land manage-

---

12. Lake Mead National Recreation Area was first withdrawn and reserved by executive order for a possible national monument. *See* Exec. Order No. 5105 (1929) and Exec. Order No. 5339 (1930). In 1964, these lands were again withdrawn and reserved by Congress for recreational purposes. *See* 16 U.S.C. §§ 460n *et seq.*

Havasu Lake National Wilderness Refuge was withdrawn and reserved by executive order in 1941 "for the use of the Department of the Interior as a refuge and breeding ground for migratory birds and other wildlife", Exec. Order No. 8647, *reprinted in* 6 Fed.Reg. 593 (1941), but subject to the "purposes of the Parker Dam Project." *Id.* at 599.

Additionally, with respect to Havasu Lake National Wildlife Refuge, the Solicitor for the De-partment of the Interior, noting that this area was "subject to use under earlier withdrawals," concluded that this area

obtained[ed] reserved water rights for refuge purposes (*e.g.,* habitat, maintenance, watering needs, etc.), carrying a priority date as of the date of reservation for refuge purposes. Superimposed refuge reservations, such as the Havasu Lake National Wildlife Refuge, received reserved water rights in *Arizona v. California,* 373 U.S. 546, 601 [83 S.Ct. 1468, 10 L.Ed.2d 542] (1963); 373 U.S. 340, 346 [84 S.Ct. 755, 758, 11 L.Ed.2d 757] (1964). *The fact that such refuges are subject to another withdrawal is a distinction without a difference.*

Op. Solic. Dep't of Interior, 86 Interior Dec. 553, 605 (1979) (emphasis added).

ment statutes such as the Federal Land Policy and Management Act (FLPMA), 90 Stat. 2744, 43 U.S.C. §§ 1701 *et seq.;* the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), 74 Stat. 215, 16 U.S.C. §§ 528 *et seq.;* the Taylor Grazing Act, 48 Stat. 1269, 43 U.S.C. §§ 315 *et seq.;* and the Wild Free-Roaming Horses & Burros Act, 85 Stat. 649–51, 16 U.S.C. §§ 1331 *et seq.* Defendant-intervenors overlook the fact, however, that none of these land management statutes effect a withdrawal and reservation of lands as does the Wilderness Act. The legislative history of the Wilderness Act reveals that the creation of a national wilderness preservation system was foremost in the minds of the members of Congress. Any additional provisions regarding management of wilderness areas were only incidental to the withdrawal and reservation of lands under the Act: "The bill further establishes incidental procedures concerning the management of the wilderness areas therein...." H.R.Rep. No. 1538, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News 3615, 3619. Thus, an analogy to these land-management statutes is irrelevant in this case.

In sum, the Wilderness Act does effect a withdrawal and reservation of wilderness areas to which the implied-reservation-of-water doctrine applies. Wilderness designation creates an entirely new category of lands dedicated to preservation and conservation. Wilderness is not simply a land-management status. Rather, wilderness areas are federal reservations whose status, as concerns the implied-reservation-of-water doctrine, is equal to that of other federal reservations such as national forests, parks, and monuments.

C. Congressional Intent and Purposes

■ Since the Wilderness Act does effect a withdrawal and reservation of wilderness areas, the question now is whether the government intended to reserve unappropriated water in those areas. As stated previously, central to this inquiry is a careful examination of both the asserted water right and the specific purposes for which the land was reserved.

■ The Wilderness Act contains several congressional statements of purpose for the National Wilderness Preservation System. Under 16 U.S.C. § 1131(a), wilderness areas are designated for the purpose of "preservation and protection in their natural condition, ... to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." Wilderness is defined by 16 U.S.C. § 1131(c) to be "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain", and is further defined as "retaining its primeval character and influence, without permanent improvements or human habitation, ... [which] has outstanding opportunities for solitude or a primitive and unconfined type of recreation; ... [and] may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value." Additionally, Congress mandated that the "wilderness areas shall be devoted to the public purposes of recreation, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b).

These purposes were emphasized again and again during the hearings and debates on the Wilderness Act. For example, it was stated that

[T]he purpose of the act seeks to prevent exploitation of these lands by humans in our increasing population and the detrimental effects on these lands of our mechanical expansion. This act guarantees to this generation and future generations of Americans the enduring *resources of the wilderness* as well as a great contribution to the enjoyment and its unimpaired future use for recreational purposes only experienced in such areas. The use must be protected by certain standards of control or rules that will protect and not defeat the public purposes of recreational, scenic, scientific, educational, conservation, and historical uses.

110 Cong.Rec. 17444 (statement of Rep. Libonati) (emphasis added). Further, Senator Hubert Humphrey, one of the earliest

sponsors of wilderness legislation, stated that

> [o]f all the pieces of legislation that have been passed, in terms of looking to the future, in terms of providing for the recreational needs of our people, in terms of preservation of the great resources of America and the need of a growing population to know something of the great out of doors, untouched and unscathed, nothing is more significant than this piece of legislation.

110 Cong.Rec. 20602 (statement of Sen. Humphrey).

While these concerns and purposes were foremost in the minds of its members, Congress also sought to carry over and maintain the purposes for which the national forests had been established. All of the above stated purposes were deemed by Congress "to be within and supplemental to the purposes for which national forests ... are established and administered...." 16 U.S.C. § 1133(a). Further, Congress stated that "[n]othing in this chapter shall be deemed to be in interference with the purpose for which national forests are established...." 16 U.S.C. § 1133(a)(1). As discussed previously, the Supreme Court has determined that the primary purposes for which national forests were created were to "conserve water flows, and to furnish a continuous supply of timber...." *New Mexico*, 438 U.S. 696, 707, 98 S.Ct. 3012, 3017, *citing* 30 Cong.Rec. 967 (1897) (statement of Rep. McRae).

At first blush, it would appear that the purposes of conserving water flows and providing a continuous supply of timber conflict with the conservation and recreational purposes set forth in the Wilderness Act. Defendant-intervenors argue that these purposes do conflict and that the Wilderness Act, like the MUSYA in *New Mexico*, creates only secondary purposes to which no reserved water rights can attach. Defendant-intervenors' argument ignores, however, the legislative history of the Wilderness Act. Additionally, their reliance on *New Mexico* as dispositive of this issue is misplaced because *New Mexico* is distinguishable in several respects.

First, the legislative history establishes that Congress was indeed concerned with protecting the watersheds and preserving water flows for downstream irrigation and domestic use as well as preserving the character of the wilderness and providing for recreation:

> If we do not act now to conserve our vanishing wilderness, it will soon be lost forever. The wilderness not only is important to those who love the outdoor life and the sportsmen who hunt and fish there; it is equally needed for nature studies and general scientific inquiry, and for wise watershed and wildlife conservation.

110 Cong.Rec. 5942 (statement of Sen. Church) (emphasis added). It was further stated that

> one of the purposes of the proposed legislation is to prevent a further opening up of the area, which is what has occurred in past years, so that the scenic and wilderness values, which are the predominant values, can be preserved, and so that the wildlife and the *watershed* can be preserved as well.

110 Cong.Rec. 5895 (statement of Sen. Church) (emphasis added).

Congress was aware of the need to protect the watersheds in these mostly high alpine wilderness areas and, clearly, it intended to carry over and maintain this important purpose in the Wilderness Act. This purpose does not, however, conflict with the other purposes of the Wilderness Act. On the contrary, preservation of wilderness areas in their natural state actually enhances water quality and quantity. By protecting the natural state of the watersheds, rather than destroying their potential yield by allowing commercial development or other similar intrusions, wilderness areas improve the availability, as well as the purity, of the water for downstream users. *See* S.R.Rep. No. 109, 88th Cong., 1st Sess. at 15 (1963) (wilderness areas "provide watershed protection and clear, pure water for users below them").

Moreover, there is legislative history which addresses this issue of conflict between the purposes of the Act:

> In earlier forms, this bill had been subject to some criticism. I am pleased to say, however, that now *it will not,* for example, *conflict* with established uses of parks, monuments, forests, or wildlife refuges.

110 Cong.Rec. 17437 (statement of Rep. Riehlman) (emphasis added).

> This bill *would not conflict* with established uses of the parks, monuments, forests, or wildlife refuges.... This bill can preserve the wilderness character of lands that will serve a vast range of *consistent purposes,* safeguarding these areas for the permanent good of the whole people.

110 Cong.Rec. 17439 (statement of Rep. Cohelan) (emphasis added).

Finally, in designating wilderness areas in Colorado specifically, Congress could not have made its intent to give effect to *all* of the purposes of the Act more clear:

> Not only do opportunities for primitive recreation and wildlife habitat protection abound in these areas, but perhaps more importantly, their natural production of invaluable supplies of high quality water provides a compelling reason for preserving them in their natural state.

H.R.Rep. No. 96–617, 96th Cong., 1st Sess. at 4 (1979).

With respect to *New Mexico,* there the Court ruled that *additional* purposes created by the MUSYA for management of the national forests were only secondary and that Congress did not intend to reserve water for those secondary purposes:

> Without legislative history to the contrary, we are led to conclude that Congress did not intend in enacting the Multiple-Use Sustained-Yield Act of 1960 to reserve water for the *secondary* purposes there established. A reservation of additional water could mean a substantial loss in the amount of water available for irrigation and domestic use, thereby defeating Congress' principal purpose of securing favorable conditions of water flow. Congress intended the national forests to be administered for broader purposes after 1960 but there is no indication that it believed the new purposes to be so crucial as to require a reservation of additional water. By reaffirming the primacy of a favorable water flow, it indicated the opposite intent.

*New Mexico,* 438 U.S. 696, 715, 98 S.Ct. 3012, 3021 (emphasis in original) (footnote omitted).

*New Mexico* is distinguishable from the instant case in several respects. First, as stated above, unlike the MUSYA, the Wilderness Act is not a land-management statute. Nor does the Act constitute an attempt to *add* to the primary purposes of existing reservations, such as the national forest, as the MUSYA did in *New Mexico.* Rather, the Wilderness Act is the *initial legislation* creating an *entirely new reservation* of federal lands.

Second, as discussed above, the conservation and recreation purposes of the Wilderness Act do not conflict with the purposes of conserving water flow. In fact, these purposes are completely compatible.[13] Nor

---

**13.** Although Congress mandated that nothing in the Wilderness Act shall be deemed to be in interference with the purpose for which national forests are established, it is clear that Congress was not referring to the purpose of providing a continuous supply of timber. Senate Report No. 109 discusses the issue at length, beginning with the fact that these areas have "long been withdrawn from cutting." S.R.Rep. No. 109, 88th Cong., 1st Sess. at 4 (1963):

> THE TIMBER RESOURCE SITUATION
> The Nation can have a wilderness system and an abundance of timber next year, and

for many, many years ahead with prudent management.

> There is no timber harvest today from the lands being considered for inclusion in the wilderness system under S. 4. ...
> The national forest lands affected by S. 4 are not now subject to exploitation for timber. Timber sales were barred by executive regulation, with rare exceptions, when the 14.3 million acres of national forests were set aside in the twenties and thirties for preservation as wilderness. Actually, because of their inaccessibility, there was little need for such a regulation. Most of the areas were, as they

is there any evidence that reservation of water for conservation and recreation purposes would "mean a substantial loss in the amount of water available for irrigation and domestic use." *New Mexico*, 438 U.S. 696, 715, 98 S.Ct. 3012, 3021. On the contrary, wilderness itself is generally a *non-consumptive* user of the water in its streams and lakes:

> I am happy that today we will finally make this principle a part of the multiple-use principle which we have followed in the use of the people's lands. Conservation is always wise use-multiple use. It encompasses consumptive use but it most certainly encompasses nonconsumptive use as well. The passage of this legislation will give complete legal status to the principle of wilderness and nonconsumptive use of the people's public lands.

110 Cong.Rec. 17442 (statement of Rep. Olsen).

Finally, unlike *New Mexico*, both the legislative history and the Wilderness Act itself are replete with statements expressing Congress' intent that each of the purposes of the Act are primary and "crucial." For example, the critical need to protect and preserve the wilderness character of these lands for future generations of Americans was expressed in the following statements; among others:

> The purpose of this measure is to afford protection for our priceless wilderness heritage, a heritage that once destroyed can never be replaced. It is impossible to restore wilderness once it is gone.

110 Cong.Rec. 17438 (statement of Rep. Bennett).

> The present legislation starts from the fundamental premise that there is a need to preserve some wilderness in the United States and that this should not disappear from our culture....

110 Cong.Rec. 17430 (statement of Rep. Saylor)

That Congress was also primarily motivated to preserve these lands for use and enjoyment by the people, rather than to "lock up" the areas, was expressed as follows:

> In emphasizing, above all, the importance of preserving the wilderness areas in perpetuity on the public lands of this country, I do not wish to detract from the use of wilderness those recreational pleasures that go with it—of hunting, fishing, hiking, swimming, mountain climbing, camping, nature photography, and the general enjoyment of natural scenery and wildlife habitat.

110 Cong.Rec. 17443 (statement of Rep. Boland).

> Of all the pieces of legislation that have been passed, in terms of looking to the future, in terms of providing for the recreational needs of our people, in terms of preservation of the great resources of America and the need of a growing population to know something of the great out of doors, untouched and unscathed, nothing is more significant than this piece of legislation.

110 Cong.Rec. 20602 (statement of Sen. Humphrey).

> Supporters of wilderness ... have sought to emphasize that the enjoyment of wilderness areas is an important and significant use in our culture.

110 Cong.Rec. 17430 (statement of Rep. Saylor).

> This act guarantees to this generation and future generations of Americans the enduring resources of the wilderness as well as a great contribution to the enjoyment and its unimpaired future use for recreational purposes only experienced in such areas. The use must be protected by certain standards of control or rules that will protect and not defeat the public

always had been, and still are, too inaccessible for exploitation.

These statements indicate that, although timber-cutting is inconsistent with wilderness purposes, Congress never intended that these areas

be subject to timber-cutting. Thus, Congress' mandate that the wilderness purposes are "within and supplemental to" the national forest purposes, including timber-cutting, is a *non-sequitur.*

purposes of recreational, scenic, scientific, educational, conservation, and historical uses.

110 Cong.Rec. 17444 (statement of Rep. Libonati).

Additionally, as discussed extensively above, Congress also considered watershed protection and conservation of water flows to be an important and primary purpose of the wilderness areas.

In sum, it is clear that Congress intended each of the purposes specified in the Wilderness Act to be primary, rather than secondary, in nature. For this reason, in addition to those stated above, *New Mexico* is inapposite.

Moreover, contrary to defendant-intervenors' assertions, Congress intended to reserve previously unappropriated waters in the wilderness areas to the extent necessary to accomplish these purposes. It is beyond cavil that water is the lifeblood of the wilderness areas. Without water, the wilderness would become deserted wastelands. In other words, without access to the requisite water, the very purposes for which the Wilderness Act was established would be entirely defeated. Clearly, this result was not intended by Congress. Accordingly, under the implied-reservation-of-water doctrine, it is implied from the Wilderness Act that Congress reserved water rights in the wilderness areas to the extent necessary to accomplish the purposes specified in the Act. Thus, I now hold that federal reserved water rights do exist in previously unappropriated water in each of the Colorado wilderness areas designated as such pursuant to the Wilderness Act and managed by federal defendants.

 Insofar as the purpose of conserving water flows was originally attached to creation of the national forests, the priority of reserved rights for that purpose dates back to the original forest reservation. *See United States v. City and County of Denver,* 656 P.2d 1, 30–31 (Colo. 1982). Reserved rights for the remaining primary purposes of the Wilderness Act vest on the date of the individual reservations or designations as wilderness. *See*

*Cappaert,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069. As stated in *Sierra Club v. Andrus,* 487 F.Supp. 443 (D.D.C.1980),

> [t]he federal reserved water right is "perfected" as of that date and is superior to any and all rights of future appropriators ... Indeed, even where there has been substantial appropriation by "junior" appropriators, the rights of the United States remain senior and unimpaired. Further, it is immaterial whether or not private appropriators have knowledge of the federal reserved water rights.

487 F.Supp. 443, 450 (citations omitted).

On the other hand, it is important to note that these reserved rights will probably have little effect on prior appropriators. Nor did Congress intend to interfere with existing water projects. For example, with respect to the La Garita Wilderness, Congress stated that

> [w]ater diversion facilities exist within a portion of the proposed additions, and it is the committee's intention that wilderness designation not interfere with necessary operation, maintenance or repair of such facilities.

H.R.Rep. No. 617, 96th Cong. 1st Sess. at 9 (1979).

Additionally, with respect to the Holy Cross Wilderness area, Congress stated that

> [n]o right, or claim of right, to the diversion and use of existing conditional water rights for the Homestake Water Development project by the cities of Aurora and Colorado Springs shall be prejudiced, expanded, diminished, altered, or affected by this Act. Nothing in this Act shall be construed to expand, abate, impair, impede, or interfere with the construction maintenance or repair of said project, nor the operation thereof, or any exchange or modification of the same agreed to by the cities and the United States, acting through any appropriate agency thereof.

Pub.L. No. 96–560, § 102(a)(5); 94 Stat. 3265 (1980).

I am well aware that summary judgment is a drastic remedy and of the Tenth Circuit's instruction that any relief afforded pursuant to Fed.R.Civ.P. 56 should be applied with care. *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir.1973). There are, however, no material issues of fact relating to the question of whether the reserved rights exist in the wilderness areas. Application of the law to the established facts in this case demonstrates that these reserved water rights exist and that Sierra Club is entitled to judgment on this issue. Therefore, I grant Sierra Club's cross-motion for summary judgment and deny defendant-intervenors' motion for summary judgment with respect to this issue.

## V. STANDARD OF REVIEW

Review of federal defendants' failure to assert reserved water rights in the Colorado wilderness areas is sought under the APA, which provides comprehensive provisions for judicial review of agency actions. Under the APA, any person "adversely affected or aggrieved" by agency action, *see* 5 U.S.C. § 702, including a "failure to act", *see* 5 U.S.C. § 551(13), is entitled to "judicial review thereof", *see* 5 U.S.C. § 702. The standards to be applied on review are governed by the provisions of § 706. Before any review may be had, however, "a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714, 721 (1985). Section 701(a) provides that the chapter on judicial review "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

In the instant case, the issue of whether § 701(a) applies, precluding review of federal defendants' inaction, has already been presented and decided. By memorandum opinion and order, I initially determined that the first exception to the APA's judicial review provisions was not applicable because there are no "existing statutes which expressly prohibit review of the agency's failure to assert federal reserved water rights in wilderness areas." *Sierra*

*Club v. Block*, 615 F.Supp. 44, 45 (D.Colo. 1985). I also found that the second exception for action "committed to agency discretion" did not preclude review in this case. *Id.* at 47. Although agency decisions to refuse enforcement are presumed to be nonreviewable under the Supreme Court's decision in *Chaney*, I found that this presumption had been rebutted in the present case because there was "law to apply." *Id.* at 48. In other words, I found that "[t]he Wilderness Act provides both legislative direction and manageable standards by which to judge the agency's failure to act in this case." *Id.* Accordingly, I held that review of federal defendants' failure to assert reserved water rights was proper under the APA. *Id.*

Since the "hurdle of § 701(a)" has been "cleared", I now turn to the standards of review found in § 706. In relevant part, that section provides that

[t]he reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ....

Sierra Club maintains that the Wilderness Act creates a duty on the part of federal defendants to protect all wilderness resources; particularly, reserved water rights. It is asserted that federal defendants' failure to claim federal reserved water rights in Colorado wilderness areas violates this duty, is arbitrary and capricious, and constitutes unlawfully withheld agency action under § 706. Sierra Club seeks summary judgment in its favor on this issue.

Federal defendants also seek summary judgment on this issue. Federal defendants admit that they have declined to request the Attorney General to initiate litigation claiming reserved water rights in the wilderness areas. Federal defendants contend, however, that this inaction was not arbitrary and capricious, an abuse of

discretion, or otherwise unlawful under § 706 for two reasons. First, federal defendants argue that the Wilderness Act imposes no express duty to assert reserved water rights in the wilderness areas. Second, they claim a rational basis for not claiming reserved water rights because the existence of these rights was uncertain up to the time of this lawsuit.

To begin with, the Wilderness Act unequivocally imposes certain duties on the part of agencies and officials administering the wilderness areas. Sections 1131(a) and 1133(b) require that the wilderness character of these areas be protected and preserved. Further, Congress stated that these areas shall be administered "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness...." 16 U.S.C. § 1131(a). Finally, § 1133(b) mandates that the "wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use" and that the agencies charged with administering the wilderness areas shall administer the areas for these purposes.

■ These mandates evince Congress' intent to impose a duty on the administering agencies to protect and preserve all wilderness resources, including water. Thus, there is a general duty under the Wilderness Act to protect and preserve wilderness water resources. There is, however, no specific *statutory* duty to claim reserved water rights in the wilderness areas even though Congress impliedly reserved such rights in order to effectuate the purposes of the Act, as discussed above.

■ In the absence of a clear statutory directive, I cannot say that federal defendants unlawfully withheld agency action under § 706(1). That section applies where a federal agency refuses to act in disregard of its legal duty to act. *See, e.g., E.E.O.C. v. Liberty Loan Corp.,* 584 F.2d 853, 856 (8th Cir.1978); *E.E.O.C. v. Bray Lumber Co.,* 478 F.Supp. 993, 996 (M.D.Ga.1979). Here, there simply is no specific legal duty

on the part of federal defendants to claim reserved water rights in the wilderness areas in state adjudications.

■ Further, absent such an explicit legal duty, I am without power to order the Attorney General to instigate litigation to claim these rights. *See Iowa ex. rel. Miller v. Block,* 771 F.2d 347 (8th Cir.1985) (court found specific statutory duties were not complied with by the Secretary of Agriculture). As stated in *Sierra Club v. Department of the Interior,* 424 F.Supp. 172 (N.D.Cal.1976),

decisions of the Congress and/or the Executive concerning further, future, additional legislation, funds or *litigation,* involve new policy-making which is the *exclusive function* of the Congress and the Executive under the doctrine of separation of powers.

It is beyond the province of this court to say whether and, if so, to what extent the Congress or Executive should act— much less to order such action. All that this court can do, and now has done, is to make sure that Interior has taken all reasonable steps toward the exercise of its *statutory* powers and performance of its duties within the limits of existing law and available funds.

Any further orders of this court, designed to mandate the Congress or the Executive to act to provide new legislation, new funds or new litigation, no matter how well intended by the court or how desirable for the protection of the Park, would be an extrajudicial and, therefore, futile injection of this court into the prerogatives of the Congress and the Executive.

424 F.Supp. 172, 175 (emphasis added).

■ Moreover, I cannot say that federal defendants' inaction in this case was arbitrary, capricious, or otherwise unlawful under § 706(2)(A). There has been considerable controversy on the issue of whether federal reserved water rights exist in the wilderness areas. *See, e.g.,* S. Waring and K. Samuelson, *Non-Indian Federal Reserved Water Rights,* 58 Den.L.J. 783, 792

(1981) (concluding these rights do not exist); Op. Solic. Dep't of Interior, 86 Interior Dec. 553 (1979) (concluding these rights do exist); Coggins & Wilkinson, *Federal Public Land and Resources Law* 321 (1981) (reserved rights do exist). Given this controversy and federal defendants' contention that they did not claim the reserved water rights because of the "uncertainty" that these rights exist, I cannot say that their decision not to claim the reserved water rights was irrational or that there was a clear error of judgment. *See Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974); *City and County of Denver, By and Through Board of Water Commissioners v. Bergland*, 517 F.Supp. 155, 180–82 (D.Colo.1981).

I can say, however, that if federal defendants had carefully analyzed the legislative history of the Wilderness Act, Congress' intent to reserve water for the wilderness areas would have been apparent. I am dismayed by federal defendants' benign neglect of this issue of federal reserved water rights in the wilderness areas as well as their failure to take any kind of action to determine whether they existed. To the extent that this benign neglect may have fostered an improper understanding of the law, federal defendants have not acted with the degree of responsibility rightfully to be expected of them. Just as clearly as judges should not inject themselves into prerogatives of the Executive, that same Executive should not ignore or disregard the intent and policy established by Congress.

Nevertheless, I find that federal defendants' failure to assert reserved water rights in the wilderness areas does not violate the provisions of the APA. Accordingly, federal defendants' motion to dismiss or, in the alternative, for summary judgment is granted on this issue. Sierra Club's corresponding summary judgment motion is denied.

I am still obligated, however, to insure federal defendants' compliance with statutory law. *See Sea-Land Service, Inc. v. Brown*, 600 F.2d 429, 434 (3d Cir.1979). Specifically, I must determine whether federal defendants' failure to assert federal reserved water rights in the wilderness areas conflicts in any way with their general statutory duty to protect wilderness water resources.

As the briefs and the administrative record show, reserved water rights is only one of several tools available to federal defendants to meet their statutory duty to protect and preserve wilderness water resources. Despite Sierra Club's attempts to prove that assertion of reserved water rights is the *only* means by which to protect the water resources, I find that the briefs and the administrative record are simply inadequate to fully evaluate this issue. Thus, I shall remand to the agencies involved to reevaluate their alternatives in light of this decision that federal reserved water rights do exist in the wilderness areas.

Now that the issue of whether reserved water rights exist in these areas has been resolved, it is necessary to give federal defendants the opportunity to consider further the usefulness of these rights in complying with their statutory duty to protect wilderness water resources. These federal defendants are required to meet clear statutory obligations. How they meet this responsibility is a matter left to their discretion. Whether they must meet this responsibility is no longer subject to dispute. In remanding this action to the federal defendants, I order them to come forward with a memorandum explaining their analysis, final decision, and plan to comply with their statutory obligations regarding protection and preservation of wilderness water resources.

## VI. PUBLIC TRUST DOCTRINE

Sierra Club asserts that in addition to the statutory duties discussed above, federal defendants hold the wilderness areas in trust for the public under the "public trust doctrine" and, therefore, are charged with the duties and obligations of a trustee, including the duty to claim reserved water

rights for these areas. Federal defendants have moved to dismiss this claim, pursuant to Fed.R.Civ.P. 12(b)(6), on the ground that they have no trust responsibility for the wilderness areas under the "public trust doctrine".[14]

For federal defendants to prevail on their motion to dismiss for failure to state a claim upon which relief can be granted, it must appear "beyond doubt that ... [Sierra Club] can prove no set of facts in support of ... [its] claim which would entitle ... [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Mitchell v. King*, 537 F.2d 385, 386 (10th Cir.1976). In ruling on a Rule 12(b)(6) motion, all facts, as distinguished from conclusory allegations, must be construed in favor of the plaintiff. *See Swanson v. Bixler*, 750 F.2d 810, 812 (10th Cir.1984); *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 172, 87 S.Ct. 1526, 1529, 18 L.Ed.2d 704 (1967). So long as Sierra Club may offer evidence to support a legally recognized claim for relief, the motion to dismiss should be denied. *See Conley*, 355 U.S. 41, 47, 78 S.Ct. 99, 102.

■ Under the "public trust doctrine", which is a common law concept,[15] "[a]ll the public lands of the nation are held in trust [by the government] for the people of the whole country." *Light v. United States*, 220 U.S. 523, 537, 31 S.Ct. 485, 488, 55 L.Ed. 570 (1911), *quoting United States v. Trinidad Coal & Coaking Co.*, 137 U.S. 160, 11 S.Ct. 57, 34 L.Ed. 640 (1890); *see also Davis v. Morton*, 469 F.2d 593, 597 (10th Cir.1972). Consistent with the right to use the lands for public purposes, the government has a duty under this doctrine to protect and preserve the lands for the public's common heritage. *See Massachusetts v. Andrus*, 594 F.2d 872, 890 (1st Cir.1979); *United States v. Beebe*, 127 U.S. 338, 342, 8 S.Ct. 1083, 1085, 32 L.Ed. 121

(1888); *Light*, 220 U.S. 523, 536, 31 S.Ct. 485, 487.

■ However, "it is not for the courts to say how that trust shall be administered. That is for Congress to determine." *Light*, 220 U.S. 523, 537, 31 S.Ct. 485, 487. Where Congress has set out statutory directives, as in the instant case, for the management and protection of public lands, those statutory duties "compris[e] *all* the responsibilities which defendants must faithfully discharge." *Sierra Club v. Andrus*, 487 F.Supp. 443, 449 (D.D.C.1980) (emphasis in original); *see also Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). Further, resort to the "public trust doctrine" as an additional remedy in this case is unnecessary given the duties already imposed by the Wilderness Act. Additionally, even if I found that the "public trust doctrine" applied and that federal defendants violated a trust duty by not claiming federal reserved water rights in the Colorado wilderness areas, as discussed above, I could not grant the relief requested by Sierra Club and order federal defendants to initiate litigation to claim those rights. Accordingly, I grant federal defendants' motion to dismiss this claim for relief.

IT IS THEREFORE ORDERED THAT:

1. Sierra Club's cross-motion for summary judgment is granted in part and denied in part.

2. Defendant-intervenors' motion for summary judgment is denied.

3. Federal defendants' motion to dismiss or, in the alternative, for summary judgment is granted on the issue of whether their inaction was arbitrary, capricious, an abuse of discretion, or otherwise unlawful under § 706 of the APA.

4. Federal defendants' motion to dismiss Sierra Club's public trust claim is granted.

**14.** Defendant-intervenors have joined in federal defendants' motion to dismiss Sierra Club's public trust claim.

**15.** For the history of the public trust doctrine, *see generally* J. Sax, *The Public Trust Doctrine in*

*Natural Resource Law: Effective Judicial Intervention,* 68 Mich.L.Rev. 471 (1970); Stevens, *The Public Trust: A Sovereign's Ancient Prerogative Becomes the People's Environmental Right,* 14 U.C.Davis L.Rev. 195 (1980).

5. This action is remanded to federal defendants to reevaluate their alternatives, including claiming reserved water rights for the wilderness areas, in complying with their statutory duty to protect wilderness water resources.

6. Federal defendants shall submit a memorandum by April 1, 1986 describing their actions on remand and their plan to comply with their statutory duty to protect wilderness water resources.

7. Sierra Club's request for attorney fees and costs is denied. All parties shall bear their own expenses incident to this action.

8. This memorandum opinion and order is intended to constitute a final appealable order in this action. The Clerk of the Court is directed to enter judgment in accordance herewith.